UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL S. JOHNSON,

        Plaintiff,

    v.                                         Case No. 18-cv-1696-bhl

SCOTT ECKSTEIN, *et al.*,

        Defendants.

## ORDER RESOLVING PROCEDURAL MOTIONS AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael S. Johnson, represented by counsel, is proceeding under 42 U.S.C §1983 on various claims against current and former officials at the Green Bay Correctional Institution (GBCI). Pursuant to an August 6, 2018 screening order, Johnson is proceeding on Eighth Amendment failure-to-protect claims against two defendants; First Amendment retaliation claims against seven defendants; and Fourteenth Amendment due process claims against two defendants. The Court also allowed Johnson to proceed on a claim for injunctive relief against Warden Eckstein based on Johnson's First and Eighth Amendment claims. After screening, Johnson's case was transferred from the Western District of Wisconsin to this Court and, on January 31, 2020, defendants moved for summary judgment. Briefing on defendants' summary judgment motion was completed on April 6, 2020.

More than two months after the summary judgment briefing was completed, on June 22, 2020, Johnson filed *pro se* motions to terminate his (*pro bono*) counsel's representation and asking that he be allowed to replace counsel's summary judgment filings with a new response brief, new responses to defendants' proposed undisputed facts, and a new "supplemental" set of proposed facts. Defendants have responded to Johnson's *pro se* filings, generally objecting but only to the extent the later filings prejudice them. Johnson's counsel has now also asked to withdraw, agreeing with Johnson that they have disagreements on case strategy.

Based on the record, counsel's motion to withdraw is **GRANTED**, Johnson's motion to terminate his counsel is **DENIED** as moot, Johnson's untimely *pro se* motions on summary judgment are **DENIED**, and defendants' summary judgment motion is **GRANTED in part and DENIED in part**.

## I. PROCEDURAL MOTIONS

Johnson asks to fire his attorney because his prison is locked down on account of the current COVID-19 pandemic, he cannot pay his attorney, and he disagrees with his attorney "on a variety of points about strategy." (ECF No. 76.) For largely the same reasons, Johnson seeks to substitute his own *pro se* filings for his counsel's summary judgment filings. (ECF No. 77.) He also accuses his counsel of failing to comply with the Court's Local Rules and insists he "cannot sit back and lose such a meritor[i]ous case over technicalities." (*Id.* at 3.) On July 15, 2020, Johnson's counsel filed his own motion to withdraw, agreeing that he and Johnson "do not agree on case strategy." (ECF No. 84.)

Defendants take no position on Johnson's motion to terminate his attorney's representation but ask that any ruling on this motion not affect resolution of their summary judgment motion. (ECF No. 82 at 3.) Defendants oppose Johnson's motion to substitute filings, asserting that Johnson should be bound by his attorney's strategic and litigation choices and arguing they would be prejudiced if the Court allows Johnson to replace his prior filings. (*Id.* at 4–7.) Defendants note that Johnson's filings include a lengthy new declaration from himself that was available months earlier and purports to fix every issue with Johnson's response that defendants addressed in their reply brief. (*Id.* at 5–6.)

The Court agrees with defendants. Johnson was fortunate to have *pro bono* counsel available to represent him and chose to accept that representation. Having done so, he must stand on his attorney's strategic choices and filings in this case. *See Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 754 (7th Cir. 2015) (noting that "litigants are bound by the acts and omissions of their chosen agents, including lawyers"); *Montague v. Wexford Health Sources, Inc.*, 615 F. App'x 378, 379 (7th Cir. 2015) (rejecting prisoner's affidavits offered in motion for reconsideration because counsel could have presented them with summary judgment materials). Moreover, granting Johnson's motion would prejudice defendants. Johnson's substituted filings seek to remedy issues raised by defendants in their reply. Allowing Johnson to address these

issues with substituted filings would circumvent this Court's rules and force defendants to file a new reply brief and new responses to Johnson's supplemental proposed facts.

The Court will **GRANT** counsel's motion to withdraw and **DENY** Johnson's motion to terminate counsel as moot. (ECF Nos. 76 & 84.) Johnson shall proceed without counsel as of the date of this order. The Court will **DENY** Johnson's *pro se* motion to substitute his summary judgment filings. (ECF No. 77.)

## II. SUMMARY JUDGMENT

### BACKGROUND FACTS

Johnson is an inmate at the GBCI. (ECF No. 70, ¶1.) He sued several defendants, all of whom previously worked or currently work at GBCI: former Warden Scott Eckstein; Security Director John Kind; former Restrictive Housing Unit (RHU) Captain Michael Schultz; former Captains Christopher Stevens (C. Stevens) and Patrick Brant; Supervising Officers Jay Van Lanen, William Swiekatowski, and James Elsinger; Correctional Sergeant Darci Stevens (D. Stevens); and RHU Social Worker Chris Heil. (*Id.*, ¶¶2–11.) Pursuant to an August 6, 2018 screening order, Johnson is proceeding on: Eighth Amendment claims against Van Lanen and Kind; First Amendment retaliation claims against Swiekatowski, Schultz, Elsinger, Heil, D. Stevens, C. Stevens and Brant; and Fourteenth Amendment due process claims against Schultz and Elsinger. The claims arise from: (1) disciplinary proceedings in which Johnson was found to have been involved in an effort to smuggle drugs into GBCI; (2) an inmate assault for which Johnson contends defendants falsely attempted to implicate him; (3) two intercepted letters between Johnson and other inmates; and (4) defendants' denial of Johnson's efforts to achieve a greater set of privileges within the RHU.

### 1. Johnson's Drug Conspiracy Conduct Report

In February 2016, gang members in the North Cell Hall of the GBCI were involved in many fights. (ECF No. 70, ¶12.) In his complaint, Johnson alleges that Swiekatowski spoke with him after a fight and asked him to use his influence with gangs to help control the violence and drug use in the prison. (ECF No. 14 at 4–5.) Swiekatowski denies speaking with Johnson about the fight and insists doing so would have been inappropriate, particularly given that Johnson was believed to be a gang member. (ECF No. 70, ¶¶13–14.) Swiekatowski acknowledges that he spoke with Johnson on a separate occasion to discuss "expectations for him to remain at [GBCI] so that we had no further issues." (ECF No. 60, ¶8.) In that

3

conversation, Johnson proposed setting up a program to counsel younger inmates with longer sentences. (*Id.*)

Johnson claims Swiekatowski issued him a false conduct report after the conversation because he refused to help Swiekatowski. (ECF No. 70, ¶15.) Swiekatowski insists the conduct report had nothing to do with the conversation but rather stemmed from monitored conversations between Johnson, another GBCI inmate, and non-inmate Mackenzi McGeshick, who agreed to help smuggle drugs and drug paraphernalia into the prison. (*Id.*, ¶¶13–17.) According to one of those monitored conversations, McGeshick agreed to bring marijuana to the prison on October 6, 2016, and when she did, the GBCI Drug Task Force confiscated ten balloons of drugs from her. (*Id.*, ¶19.) Swiekatowski issued Johnson and the other inmate conduct reports for their involvement in the conspiracy. (*Id.*, ¶20.) Swiekatowski cited Johnson for conspiracy to possess intoxicants based on the monitored calls and McGeshick's appearance at the prison with the drugs at the time she had agreed to bring them. (*Id.*, ¶¶21–22.)

Johnson disputes Swiekatowski's description of the monitored calls, insisting he only spoke with McGeshick about arranging payment of a gambling debt on behalf of McGeshick's then-boyfriend, who was the other inmate on the monitored phone calls. (ECF No. 72, ¶¶16–17 (citing ECF No. 72-21, ¶¶2–3).) Johnson claims Swiekatowski "manufactured enough evidence" to cite Johnson and was retaliating for Johnson's refusal to assist Swiekatowski. (*Id.*, ¶¶22, 24.)

On October 12, 2016, Schultz, who had no part in the investigation that led to the report, notified Johnson of an October 20, 2015 hearing on the drug conspiracy conduct report with Schultz serving as hearing officer. (ECF No. 70, ¶¶25–27.) Schultz admits he offered Johnson an uncontested disposition of 180 days' disciplinary segregation based on his overview of the conduct report and evidence. (*Id.*, ¶¶27–28.) Johnson claims, however, that Schultz said he was going to find Johnson guilty of the offense, so he should take the 180 days' punishment. (ECF No. 72, ¶27.) In support of his version of events, Johnson cites to a declaration from inmate Matthew Richard, in which Richard states he overheard Schultz offer Johnson 120 (not 180) days' segregation if Johnson would waive his due process rights. (*Id.*, ¶28 (citing ECF No. 72-4).) It is undisputed that Johnson refused Schultz' offer, however and whenever conveyed. (ECF No. 72, ¶29.)

At the October 20, 2016 hearing, Kind denied Johnson's request to allow the other inmate on the phone calls to attend the hearing and denied Johnson a transcript of the recorded calls.

(ECF No. 72, ¶¶30–31.) Johnson did not argue at the hearing that Swiekatowski had issued the conduct report in retaliation for his refusal to help Swiekatowski in February 2016, and Schultz was not aware of that accusation. (*Id.*, ¶37.) After considering all the evidence, Schultz found Swiekatowski's conduct report credible and Johnson guilty of violating prison rules. (*Id.*, ¶¶32–34.) Schultz imposed the previously offered 180 days' disciplinary separation, half of the maximum allowed 360 days' separation. (*Id.*, ¶¶35–36.) Schultz asserts that his decision was based on the evidence, while Johnson reiterates that Schultz had already decided to impose 180 days' punishment before the hearing. (*Id.*, ¶38; ECF No. 72, ¶38.)

Johnson filed an inmate complaint challenging the conduct report and the disciplinary hearing. (ECF No. 70, ¶39.) On February 15, 2017, Elsinger served Johnson notice that the report would be reheard on March 2, 2017, and Elsinger would be the hearing officer. (*Id.*, ¶¶40, 42.) Elsinger was not involved in the investigation that led to the conduct report. (*Id.*, ¶41.) Elsinger offered Johnson an uncontested disposition of 180 days' disciplinary separation based on the conduct report. (*Id.*, ¶42.) Johnson contends that Elsinger told him he was going to impose the 180 days as punishment either way, and that because Johnson had served almost that entire time already he should "just take it." (ECF No. 72, ¶43.) Johnson asserts that other inmates overheard Elsinger say this. (*Id.* (*see* ECF No. 72-4, ¶¶7–10).)

At the rehearing, Elsinger and Johnson's staff advocate listened to the monitored phone calls. (ECF No. 70, ¶44.) Johnson did not argue that Swiekatowski issued the conduct report in retaliation for Johnson's refusal to help him, and Elsinger is unaware of that accusation. (*Id.*, ¶48.) Eslinger considered all the evidence and determined Johnson more likely than not conspired with McGeshick to possess intoxicants. (*Id.*, ¶46.) He imposed 180 days' disciplinary separation. (*Id.*, ¶47.) Johnson reiterates that he never told McGeshick to bring drugs into the prison and asserts that Elsinger's findings were based on that false interpretation of the evidence. (ECF No. 72, ¶¶46, 49.)

C. Stevens states that he was not made aware of Johnson's inmate complaint about the conduct report Swiekatowski issued against him. (ECF No. 70, ¶¶76–77.) An institution complaint examiner did not contact C. Stevens about Johnson's complaint, nor did the complaint examiner copy any GBCI staff members on the report or on Warden Eckstein's decision on the complaint. (*Id.*, ¶¶78–79.)

## 2. Defendants' Investigation of a December 11, 2016 Inmate Assault

Johnson has been in the RHU since September 23, 2016. (ECF No. 70, ¶61.) Defendants describe the RHU as "a safe, controlled environment" where inmates are housed in single cells, are always transferred by staff members and in restraints, and may not congregate with other inmates. (*Id.*, ¶¶62–63.) Defendants contend that Johnson faced a low risk of assault in these conditions. (*Id.*, ¶63.)

On December 11, 2016, inmate Shirell Watkins was assaulted in the cafeteria. (ECF No. 70, ¶50.) According to Van Lanen, he asked Watkins who ordered the assault, and Watkins told him it had to be a high-ranking gang member because of Watkins's own status within a rival gang. (*Id.*) Because Johnson was a high-ranking gang member, Van Lanen and C. Stevens asked Johnson if he knew who ordered the assault on Watkins, but Johnson denied any knowledge or involvement. (*Id.*, ¶51.) Johnson maintains he is no longer involved in gang activity and accuses Van Lanen of falsely telling Watkins that Johnson ordered the assault. (ECF No. 72, ¶¶50–51.) Johnson cites a declaration from Watkins, who swears he told Van Lanen he knew "for a fact" that Johnson did not order the assault and "fell back from everything years ago." (*Id.*, ¶51; ECF No. 72-11, ¶¶2–3.)

C. Stevens and Van Lanen interviewed several other inmates about the assault. (ECF No. 70, ¶53.) According to Van Lanen, he and C. Stevens did not implicate Johnson in the attacks and did not mention Johnson's name at all. He also reports that the inmates were placed in temporary lock-up pending the investigation so the inmates could not communicate with one another or collaborate before being interviewed. (*Id.*, ¶¶54–55.) Johnson alleges that Van Lanen and C. Stevens not only told other inmates that he had ordered the attack but attempted to coerce the inmates into lying to implicate him. (ECF No. 72, ¶53 (citing ECF Nos. 72-6, 72-10, 72-11, 72-12, 72-15, & 72-19).)

The RHU unit sergeant (who is not a defendant) placed inmates Christopher Jordan-Davis and Matthew Richard in open cells next to Johnson. (ECF No. 70, ¶56.) Van Lanen was not involved in that decision. (*Id.*) Van Lanen asserts that he did not tell either inmate to implicate Johnson in the attack on Watkins and does not know what those inmates told Johnson. (*Id.*, ¶57.) Johnson contends Richard "was asked to lie to implicate Plaintiff" and claims Swiekatowski told Jordan-Davis that Johnson had ordered the attack on Watkins. (ECF No. 72, ¶57 (citing ECF No. 72-6 & ECF No. 72-19).) It is undisputed that, after interviewing the

6

inmates, Van Lanen and C. Stevens concluded that Johnson was not involved in Watkins's assault and, in fact, two other inmates, not Johnson, were issued conduct reports for the assault. (ECF No. 70, ¶58.)

Johnson claims that gang members planned to retaliate against him for the Watkins attack. (ECF No. 72, ¶63.) He filed an inmate complaint against Van Lanen, alleging that Van Lanen put him at risk by telling other inmates that he had ordered the attack on Watkins. (ECF No. 70, ¶64.) GBCI staff told Johnson to contact Kind to report Van Lanen's alleged actions. (*Id.*, ¶65.) Johnson complains that no investigation was done on his complaint against Van Lanen, and he attached two letters he states he sent to Kind about Van Lanen in December 2016 and January 2017. (ECF No. 72, ¶¶65, 68; ECF Nos. 72-24 & 72-25.) Kind states that he scans into his computer all inmate correspondence he receives and retains a copy of his responses. (ECF No. 70, ¶67.) He states that he cannot find any correspondence from Johnson in December 2016 or January 2017 about his complaint or allegations against Van Lanen. (*Id.*, ¶¶65, 68; ECF No. 61, ¶¶5, 9.) Kind states that GBCI investigated Johnson's complaint against Van Lanen and concluded that it was unsubstantiated and meritless. (ECF No. 70, ¶66.)

### 3. *Defendants' Inspection of Johnson's Letters to Other Inmates*

In December 2016, GBCI staff inspected a letter Johnson sent to Joseph Lussier, another GBCI inmate. (ECF No. 70, ¶¶69, 80.) According to defendants, GBCI staff always review inmate-to-inmate mail, even if the sending inmate is not on mail monitoring, pursuant to Wisconsin law. (*Id.*, ¶¶70–71 (citing Wis. Admin. Code § DOC 309.04(4)).) Heil, the RHU social worker assigned to Johnson since September 2016, does not have the authority to put an inmate on mail monitoring and has no responsibility to intercept mail within GBCI. (*Id.*, ¶72.) C. Stevens states that he did not put Johnson on mail monitoring in 2016, and there are no records showing that he did. (*Id.*, ¶74.)

C. Stevens received the letter but delegated review to a Security Threat Group Specialist at GBCI, D. Stevens. (ECF No. 70, ¶81.) D. Stevens reviewed the letter and determined that Johnson was discussing gang activity. (*Id.*, ¶¶82, 88.) In the letter, Johnson sought information about a recent assault at GBCI, attempted to recruit Lussier to join Johnson's gang, and asked Lussier to put money on another inmate's phone account. (*Id.*, ¶83.)

Johnson disputes D. Stevens's reading of the letter and contends that he was discussing "religious matters" and attempting to convince Lussier to reduce gang activity in GBCI. (ECF

7

No. 72, ¶¶82–83.)  He insists D. Stevens "misinterpreted" the phrases he used in the letter as discussing gang activity.  (*Id.*, ¶88.)

D. Stevens nevertheless concluded that the letter violated prison rules and wrote him a conduct report for "Group Resistance and Petitions" and "Enterprises and Fraud (Conspiracy)."  (ECF No. 70, ¶84.)  She states that she did not issue the conduct report in retaliation for complaints Johnson had filed or because he had discussed his religion in the letter.  (*Id.*, ¶87.)  D. Stevens asked Brant, the Security Threat Group Coordinator at the time, to review the letter.  (*Id.*, ¶85.)  Brant concluded that the letter supported the offenses with which D. Stevens had charged Johnson.  (*Id.*, ¶86.)

The conduct report on the Lussier letter was scheduled for a January 5, 2017 disciplinary hearing with Schultz acting as the hearing officer.  (ECF No. 70, ¶89.)  Schultz was not involved with confiscating the letter or investigating its contents.  (*Id.*, ¶90.)  On December 23, 2016, Elsinger provided Johnson with a copy of the conduct report and notice of the hearing.  (*Id.*, ¶91.)  The hearing evidence included testimony from D. Stevens and statements from Johnson and Lussier.  (*Id.*, ¶92.)  Schultz concluded that the letter more likely than not discussed gang activity and imposed 90 days' disciplinary separation out of a possible maximum of 360 days.  (*Id.*, ¶¶93–94, 96.)  The parties dispute whether Johnson argued at the hearing that D. Stevens issued him the conduct report in retaliation for his complaints about prison conditions.  (*Id.*, ¶95.)  Schultz contends he did not, while Johnson asserts he did make the argument and that Schultz simply omitted the argument from the hearing record.  (ECF No. 72, ¶95.)  Johnson insists that Schultz "had made it known that he wanted trouble for Plaintiff."  (*Id.* (citing ECF No. 72-17).)

In early 2017, staff reviewed a second letter from Johnson, this one sent to inmate Darnel Bradley.  Brant reviewed the letter for signs of gang activity and believed Johnson remained involved in gang activity and was a high-ranking gang member.  (ECF No. 70, ¶¶97–99.)  Based on past reviews of prisoner letters, Brant believed the letter made several references to gang activity, including Johnson's involvement in the gang, his involvement in an assault against a rival gang, and hierarchical positions within his gang.  (*Id.*, ¶¶100, 103.)  Brant also believed the letter contained several religious references to hide the discussion of gang activity.  (*Id.*, ¶101.)

Johnson disputes that he is still involved in gang activity.  (ECF No. 72, ¶99.)  He also disputes Brant's reading of the letter and asserts it discussed only religious references and not gang activity.  (*Id.*, ¶¶100–103.)

8

On January 11, 2017, Brant wrote Johnson a conduct report charging him with "Group Resistance and Petitions," "Unauthorized Forms of Communications," and "Enterprises and Fraud." (ECF No. 70, ¶104.) The same day, Johnson submitted an inmate complaint against D. Stevens, but the complaint examiner's office did not receive it until January 13, 2017. (*Id.*, ¶¶105–106.) Brant insists he was not contacted about Johnson's complaint against D. Stevens and was not involved in the investigation into that complaint. (*Id.*, ¶¶107–108.)

Schultz again served as the hearing officer for the hearing on the conduct report related to the Bradley letter. (ECF No. 70, ¶109.) He was again not involved in the conduct report or interception of the letter. (*Id.*, ¶110.) Johnson was provided notice of the hearing on January 25, 2017. (*Id.*, ¶111.) At the January 30, 2017 hearing, Johnson admitted to the "Enterprises and Fraud" violation and was found guilty of the other two violations. (*Id.*, ¶¶113–114.) Johnson did not testify that Brant wrote the conduct report in retaliation for the Johnson's complaint against D. Stevens. (*Id.*, ¶117.) Schultz concluded that the letter to Bradley clearly attempted to start a company to further the agenda of the gang. (*Id.*, ¶114.) He also considered Johnson's conduct history of similar rule violations, including his discipline for the letter he sent to Lussier. (*Id.*, ¶116.) Schultz imposed a punishment of 120 days' disciplinary separation out of a possible maximum 360 days. (*Id.*, ¶115.) Johnson contends Schultz did not base his punishment on the evidence and contends that Schultz was overheard telling Johnson that he complains too much. (ECF No. 72, ¶¶118–119.)

Johnson appealed Schultz's decision, and the Warden ordered a rehearing because Johnson's inmate witness never submitted a statement. (ECF No. 70, ¶120.) Elsinger served as hearing officer for the rehearing, which occurred on February 21, 2017. (*Id.*, ¶121.) Elsinger was not involved in the conduct report or the investigation of the Johnson's outgoing mail. (*Id.*, ¶122.) Before the rehearing, Elsinger offered Johnson an uncontested disposition of 90 days disciplinary separation and 30 days loss of recreation, which Johnson accepted. (*Id.*, ¶123.) By accepting that disposition, Johnson admitted his guilt of the charges and waived his right to a hearing or appeal. (*Id.*, ¶124.) Elsinger states he did not offer the lower disposition because of Johnson's inmate complaints about other staff members or conditions at GBCI. (*Id.*, ¶126.)

### 4. Johnson's Failure to Advance in the Behavior Modification Program

GBCI has a Behavioral Modification Program, also called a Step Program, that has three different steps or sets of privileges for inmates in the RHU. (ECF No. 70, ¶127.) RHU staff

review inmates every thirty days and recommend an appropriate "step" for that inmate, based on the violations that led him to RHU placement, a report of his recent conduct history, a mental health evaluation, and his overall attitude and behavior in the RHU. (*Id.*, ¶¶127, 129.) The evaluation team is made of up a security supervisor or program supervisor, HSU staff, psychological services staff, a social worker, and/or other security staff in the RHU. (*Id.*, ¶128.) This team makes the recommendation per each inmate, the security director reviews the recommendation, and the Warden makes the final decision. (*Id.*, ¶127.)

Schultz was involved in several of Johnson's behavior modification reviews. Johnson was assigned to the RHU on October 20, 2016, based on his punishment of 180 days' disciplinary confinement for the drug conspiracy conduct report. (ECF No. 70, ¶130.) He entered the RHU at Step 1. (*Id.*, ¶131.) Defendants state that, because of Johnson's discipline for the drug conspiracy with McGeshick and the other inmate, the RHU team recommended that Johnson remain at Step 1 after his first thirty-day review. (*Id.*, ¶132.) Security Director Kind and the Warden agreed. (*Id.*) At Johnson's December 2016 review, the RHU team recommended that he remain at Step 1 because he had a new major offense conduct report. (*Id.*, ¶133.) The deputy warden rejected that recommendation and promoted Johnson to Step 2. (*Id.*) By the time of Johnson's January 2017 review, he had been convicted for sending the letter to Lussier, and the RHU team recommended that he be demoted to Step 1. (*Id.* ¶¶134–135.) Kind and the Warden agreed and returned Johnson to Step 1. (*Id.*, ¶135.) By the time of Johnson's February 2017 review, he had been convicted of gang activity based on the letter he sent to Bradley. (*Id.*, ¶136.) The RHU team recommended he remain at Step 1, and Kind and the Warden agreed. (*Id.*) The last review in which Schultz was involved was in March 2017. (*Id.*, ¶137.) Johnson had no new conduct reports, and the RHU recommended he be promoted to Step 2. (*Id.*) Kind and the Warden disagreed and kept him at Step 1. (*Id.*)

Schultz asserts that no institutional complaint examiner contacted him about any inmate complaint that Johnson filed against him for allegedly violating Johnson's due process rights. (ECF No. 70, ¶138.) Nor did anyone contact Schultz about Johnson's complaint against Van Lanen. (*Id.*, ¶139.) Schultz insists that none of the RHU team's placement decisions were based on Johnson's various inmate complaints. (*Id.*, ¶140.) Johnson disputes the reasons for his inability to progress through the Steps, contending that Schultz told him "he would not progress

through the Steps because he complains too much, and he would be promoted when he stops filing complaints."  (ECF No. 72, ¶¶132, 134–136, 139–140.)

SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Material facts" are those that "might affect the outcome of the suit."  *See Anderson*, 477 U.S. at 248.  A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*  "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment."  *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor.  *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).  A party may provide this evidence through affidavits or declarations but only if the affidavits "(1) attest[] to facts of which the affiant has 'personal knowledge'; (2) 'set[] out facts that would be admissible in evidence'; and (3) 'show[] that the affiant or declarant is competent to testify on the matters stated.'"  *James v. Hale*, No. 19-1857, 2020 WL 2487603, at *5 (7th Cir. May 14, 2020) (quoting Fed. R. Civ. P. 56(c)(4)).  Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

ANALYSIS

## I.    Johnson's First Amendment Retaliation Claims

Johnson is proceeding on several different First Amendment retaliation claims, stemming from his alleged initial refusal to help Swiekatowski deter gang activity and the later grievances and complaints that Johnson made against various defendants.  To prove a claim of retaliation, a plaintiff must show that "he engaged in a protected activity, he suffered a deprivation likely to prevent future protected activities, and there was a causal connection between the two."  *Felton v. Huibregtse*, 525 F. App'x 484, 486 (7th Cir. 2013) (citing *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010), and *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).  As a general matter, defendants do not contest for the purposes of this decision that Johnson engaged in

11

protected activities or that he suffered deprivations.  (ECF No. 69 at 28.)  But they contend summary judgment is appropriate because there was no causal link between Johnson's activity and the consequences he states he suffered.

To prove causation, Johnson must show more than that defendants' actions occurred after his protected activity; he must show that defendants had actual knowledge of his protected conduct and acted because of it.  *See Healy v. City of Chicago*, 450 F.3d 732, 740–41 (7th Cir. 2006).  A plaintiff's speculation alone about the defendants' retaliatory motive "cannot create a genuine issue of material fact sufficient to survive a motion for summary judgment."  *Parrilla v. Beahm*, No. 17-C-841, 2018 WL 3717026, at *6 (E.D. Wis. Aug. 3, 2018) (citing *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013)).  If the plaintiff makes this showing, the Court must determine whether the defendant has shown, by a preponderance of evidence, that they "would have reached the same decision . . . even in the absence of the protected conduct."  *Green v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 US. 274, 287 (1977)).

### A.    Retaliation for Refusing to Help with Gang Activity (Swiekatowski)

Johnson's first relation claim is that Swiekatowski issued him a false conduct citation based on Johnson's refusal to help Swiekatowski reduce gang conduct.  The parties dispute whether Swiekatowski spoke with Johnson in February 2016 about gang activity and attempted to solicit his assistance.  But even if Johnson's account is correct, Swiekatowski is entitled to summary judgment because there is no evidence that he issued the conduct report as an act of retaliation.  While the conduct report was issued after Johnson claims he refused to assist Swiekatowski, that timing alone does not establish causation.  Indeed, Swiekatowski issued the conduct report in October 2016, over seven months after Johnson states he spoke with Swiekatowski about reducing gang activity.  The passage of that much time cuts against Johnson's claim that Swiekatowski's motive was retaliatory.  The Seventh Circuit has repeatedly held "that a time lag of seven months is too long to permit a reasonable inference of retaliation."  *Shaw v. Litscher*, 715 F. App'x 521, 523 (7th Cir. 2017) (citing cases).

Johnson's efforts to dispute the conduct report itself are also without merit.  He insists that Swiekatowski and other GBCI officials were mistaken about his conversations with McGeshick and cites McGeshick's declaration, in which she credits his version of the monitored telephone call.  (ECF No. 72-21, ¶3.)  But even if Johnson's version of the call was correct and

Swiekatowski's wrong, the misinterpretation of the conversation and incorrect issuance of a conduct report do not mean the report was issued in retaliation. Johnson offers only his unsupported speculation to suggest that Swiekatowski was acting with a retaliatory motive, and without any supporting evidence, that speculation does not create a genuine dispute of fact.

**B.      Grievance Retaliation Claims (C. Stevens, Heil, D. Stevens, Brant, Schultz, and Elsinger).**

Johnson also asserts claims against C. Stevens, Heil, D. Stevens, Brant, Schultz, and Elsinger contending they improperly retaliated against him for filing grievances against staff members, for complaining about the conditions of segregation, and for complaining about staff in a letter. Like his retaliation claim against Swiekatowski, these claims suffer from a lack of evidence on causation.

Johnson claims that C. Stevens and Heil monitored Johnson's mail, or placed him on mail monitoring, in retaliation for his filing of an inmate conduct report against Swiekatowski. But the record shows that GBCI staff reviews all inmate-to-inmate mail, and C. Stevens explained that he merely reviewed the letter that Johnson sent to Lussier after another staff member intercepted it. Johnson does not dispute C. Stevens's statement that he did not place Johnson on mail monitoring and is unaware of any other staff member monitoring Johnson's mail. As for Heil, Johnson does not dispute that Heil, as a social worker, has no authority to place an inmate on mail monitoring. Because Johnson provides no evidence that either C. Stevens or Heil even was aware of his inmate complaint against Swiekatowski, much less took any adverse action against him because of it, both are entitled to summary judgment.

Johnson claims that D. Stevens issued him a conduct report based on the Lussier letter in retaliation for complaints Johnson made in that letter about prison conditions and staff. But Johnson again fails to show the conduct report was the result of the complaints about conditions and staff. The record shows that D. Stevens believed the letter violated prison rules and issued the conduct report based on that belief. (ECF No. 70, ¶84.) Like his assertion that Swiekatowski misinterpreted the calls with McGeshick, Johnson's assertion that D. Stevens misinterpreted phrases in the letter shows, at best, that her conduct report was mistaken; it does not provide a basis to conclude that she wrote the conduct report in retaliation for Johnson's conduct. Even if she had misinterpreted the letter, that does not mean her decision to issue the conduct report was done in retaliation. *See Wilcher v. Raemisch*, No. 12-CV-803-JDP, 2014 WL 3509395, at \*8

13

(W.D. Wis. July 15, 2014) (citing cases for proposition that a mistakenly belief that an inmate has violated a prison rule "is insufficient to show pretext in the context of a retaliation claim").

Johnson claims that Brant issued a conduct report against him in retaliation for Johnson's inmate complaint against D. Stevens. But the record shows Brant issued the conduct report based on Johnson's letter to inmate Bradley. Johnson again insists that Brant misinterpreted the letter, but as discussed above, even if that were true, it would not be proof of retaliation. Moreover, it is undisputed that Brant completed the conduct report on January 11, 2017, and the institutional complaint examiner did not even receive Johnson's complaint about D. Stevens until two days later, on January 13, 2017. Brant is also entitled to summary judgment on Johnson's retaliation claim.

Johnson's retaliation claims against Schultz and Elsinger are premised on claims that they punished him with excessive time in segregation in retaliation for filing grievances against staff members and complaining about the conditions in segregation. The record shows that Schultz was the hearing officer assigned to Johnson's initial hearing on his conduct report about conspiring with McGeshick to bring drugs into the prison, and Elsinger was hearing officer assigned to the rehearing on that conduct report. Johnson points to a declaration from inmate Matthew Richard, in which Richard claims he overheard Johnson discussing his disciplinary hearings with Schultz and Elsinger. (ECF No. 72-4.) But the declaration says nothing about inmate complaints that Johnson wrote about staff, the conditions of his confinement, or otherwise provide factual support for Johnson's retaliation claims. Both Schultz and Elsinger state in their declarations that they imposed a punishment that they believed fitting based on the evidence presented at the disciplinary hearing and rehearing, and neither imposed the maximum 360 days' disciplinary separation for Johnson's conduct reports, instead imposing punishments of 180 days' separation or less. (ECF No. 62, ¶22; ECF No. 63, ¶¶16–17.) Because Johnson offers no evidence to contest their declarations or show that they were aware of Johnson's previous inmate complaints when they imposed punishment, Schultz and Elsinger are entitled to summary judgment on this claim.

Johnson's final retaliation claim—that Schultz demoted him in the Behavior Modification Program in retaliation for inmate complaints Johnson filed against Van Lanen—is a different story. While Schultz swears that the RHU team determined the appropriate step for Johnson based on his past conduct reports and the severity of his actions related to those reports (ECF

14

No. 62, ¶¶56–60), Johnson provides sworn declarations from other inmates swearing that they overheard Schultz telling Johnson that he would not be promoted through the Behavior Modification Program "because he complains too much, and he would be promoted when he stops filing complaints." (ECF No. 72, ¶¶132, 134–136, 139–140.) These statements, taken in the light most favorable to Johnson as the non-moving party, create a genuine dispute of fact whether Schultz refused to advance Johnson in the Behavioral Modification Program because of his inmate complaints. As the defendants correctly acknowledge (ECF No. 75 at 17–18), summary judgment on this claim is therefore inappropriate.

## II.     Eighth Amendment Claims

Johnson is also proceeding on Eighth Amendment-based claims that Van Lanen placed Johnson in physical danger by telling other inmates that Johnson ordered the attack on Watkins and by telling them to lie and say Johnson ordered the attack. Johnson also claims that he told Kind about Van Lanen's actions, but Kind failed to intervene and protect him from the potential harm.

The Court reviews Johnson's failure to protect claims under the Eighth Amendment's prohibition of cruel and unusual punishments. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (quotations omitted) (noting that prison officials "must take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners"). An Eighth Amendment claim consists of both objective and subjective components. *Farmer*, 511 U.S. at 834. To satisfy the objective component, a prisoner must show that he "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* It is not enough to demonstrate "a generalized risk of violence." *Wilson v. Ryker*, 451 F. App'x 588, 589 (7th Cir. 2011) (citing *Brown v. Budz*, 398 F.3d 904, 909, 913 (7th Cir. 2005)). The plaintiff must show that there was "a tangible threat to his safety or well-being" or, in other words, a risk "almost certain to materialize if nothing is done." *Id.* (citing *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008), and *Brown*, 398 F.3d at 911 (internal quotations omitted)). To satisfy the subjective component, the plaintiff must demonstrate that the official acted with the requisite intent, that is, that he had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. A prison official cannot be found liable under the Eighth Amendment unless he subjectively knows of an excessive risk of harm to an inmate's

health or safety and disregards that risk. *Id.* at 837; *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

The parties dispute whether Van Lanen made the statements to other prisoners as Johnson alleges. Van Lanen swears that he did not tell other inmates that he believed Johnson was responsible for the attack on Watkins and did not ask them to implicate Johnson falsely in the attack. (ECF No. 64, ¶¶11, 14.) Johnson offers declarations from several inmates who state that Van Lanen told them that Johnson ordered the attack. (ECF No. 72, ¶53.) Van Lanen acknowledges that it would be dangerous if he told other inmates that Johnson had ordered an assault on him "because that would not only place [the plaintiff's] life in danger but would also compromise the safety and security of the rest of the institution, staff and other inmates." (ECF No. 64, ¶16.) Those inmates' statements create a dispute whether Van Lanen told inmates that Johnson was responsible for the attack on Watkins. If he had, a jury could conclude that Van Lanen would be generally aware of a threat to Johnson if other inmates were informed that Johnson had ordered the attack on Watkins.

But the record does not contain evidence sufficient to satisfy the objective element of Johnson's failure to protect claim against Van Lanen. That Johnson may have generally faced harm from Van Lanen's alleged comments to other prisoners does not mean Johnson was at a substantial risk of serious harm. He does not allege that any particular inmate or inmates had threatened him or would be likely to cause him harm because of Van Lanen's statements. Johnson's allegations of "a generalized risk of violence" are insufficient to satisfy the objective element and show that he faced a substantial danger of serious harm. *See Wilson*, 451 F. App'x at 588. Nor is Johnson's unsupported assertion that Van Lanen put his life in danger (ECF No. 72, ¶60) sufficient to survive summary judgment. Because Johnson cannot satisfy the objective component of his Eighth Amendment claim, Van Lanen is entitled to summary judgment.

Johnson's failure to protect claim against Kind likewise fails. Because Johnson cannot show that Van Lanen subjected him to a substantial risk of serious harm, he cannot show that Kind's failure to act on Johnson's alleged complaints about Van Lanen subjected him to a substantial risk of harm. Kind is also entitled to summary judgment.

16

### III.    Fourteenth Amendment Claims

Johnson's final claims are that Schultz and Elsinger violated his due process rights by denying him fair disciplinary proceedings.  Under the Fourteenth Amendment, prisoners are entitled to impartial decisionmakers in their disciplinary hearings.  *White v. Indiana Parole Bd.*, 266 F.3d 759, 767 (7th Cir. 2001) (citing *Wolff v. McDonnell*, 418 U.S. 539, 570–71 (1974)).  Johnson asserts that Schultz and Elsinger were not impartial hearing officers and in fact told him before the hearings they were going to rule against him regardless of the evidence presented.  In support of this claim, Johnson cites an affidavit from inmate Matthew Richard, who states, under penalty of perjury, that he overheard conversations between Schultz and Johnson in which Schultz reportedly told Johnson "that if he hadn't just been in front of him for a group resistance [conduct report] that he would likely hear him out."  (ECF No. 72-4, ¶¶2–5.)  Richard also declares he overheard Elsinger tell Johnson prior to the rehearing on that complaint that Elsinger was going to impose the same 180 days' punishment Johnson previously received and that he should accept it because he "has already got most of the 180 in."  (*Id.*, ¶10.)  Johnson refused and told Elsinger that he wanted "his full due process rights."  (*Id.*, ¶11.)  Schultz and Elsinger dispute the content of these conversations.  (ECF No. 62, ¶¶12–15; ECF No. 63, ¶¶10–11.)

These competing submissions establish that a dispute exists over whether either defendant attempted to coerce Johnson into taking an uncontested disposition.  Summary judgment is thus inappropriate on these claims.

### IV.    Injunctive Relief

The Court permitted Johnson to proceed on an official capacity claim against Warden Eckstein for the purposes of seeking injunctive relief on his First and Eighth Amendment claims.  The Court will grant summary judgment for the defendants on Johnson's Eighth Amendment claims but will allow his First Amendment claim against Schultz to proceed.

Specific to his First Amendment claims, Johnson requests an injunction prohibiting the defendants from relying on the conduct reports that he asserts the defendants fabricated against him in retaliation for inmate complaints he filed.  (ECF No. 1 at 27.)  The Court is not permitting Johnson to proceed on his First Amendment claims related to those conduct reports.  The only First Amendment claim on which Johnson may proceed is against Schultz for demoting him in the Behavior Program Unit because of inmate complaints Johnson filed against Van Lanen.  Because the Court is dismissing the underlying First Amendment claims on which the request for

injunctive relief is based, Johnson will not be permitted to seek injunctive relief on those claims. The Court will therefore **DISMISS** Johnson's official capacity claim against Warden Eckstein and **DENY** his request for injunctive relief.

## CONCLUSION

The Court **GRANTS in part and DENIES in part** the defendants' motion for summary judgment. (ECF No. 58.) The Court will allow Johnson to proceed on his First Amendment claim against defendant Schultz and on his Fourteenth Amendment claims against defendants Schultz and Elsinger.[1]

The Court **DISMISSES** all other claims and defendants.

The Court **DENIES** Johnson's *pro se* motion to substitute his summary judgment filings. (ECF No. 77.)

The Court **GRANTS** counsel's motion to withdraw as attorney for Johnson and **DENIES** Johnson's motion to terminate counsel as his attorney as moot. (ECF Nos. 76 & 84.)

The Court will enter a separate order setting a status conference to discuss the next steps.

Dated in Milwaukee, Wisconsin this 28th day of October, 2020.

BY THE COURT:

s/ Brett H/ Ludwig_____
BRETT H. LUDWIG
United States District Judge

---

[1] The defendants concede that the First Amendment claim against Schultz and the Fourteenth Amendment claims against Schultz and Elsinger should proceed to trial. Because the Court is granting summary judgment to the defendants on the merits, they do not need qualified immunity. *Sierra-Lopez v. Brown County*, No. 17-CV-1222-PP, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing *Viero v. Bufano*, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996), and *Antepenko v. Domrois*, No. 17-CV-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

18