UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL S. JOHNSON,

        Plaintiff,

        v.                                Case No. 18-cv-1696-bhl

MICHAEL SCHULTZ and
JAMES ELSINGER,

        Defendants.

## DECISION AND ORDER

      Plaintiff Michael S. Johnson, an inmate at Green Bay Correctional Institution (GBCI), brought this action under 42 U.S.C. §1983, alleging that various GBCI employees violated his civil rights. On October 28, 2020, the Court granted in part and denied in part Defendants' motion for summary judgment, leaving two claims for trial, based on allegations that: (1) defendants Michael Schultz and James Elsinger violated Johnson's 14th Amendment Due Process rights in connection with hearings on Johnson's inmate complaints; and (2) defendant Michael Schultz violated Johnson's First Amendment rights by retaliating against him for filing inmate complaints. On April 4, 2022, the Court held a bench trial on these claims at which the parties presented testimony from six witnesses and entered seventeen exhibits into evidence. After the evidence closed, Johnson voluntarily dismissed his First Amendment claim. This decision and order resolves Johnson's remaining 14th Amendment claims.

## FACTUAL FINDINGS[1]

### I. Drug Conspiracy Conduct Report

      In mid-September of 2016, GBCI staff recorded two telephone conversations between Johnson and a woman named Mackenzi McGeshick. At trial, McGeshick testified she knew Johnson through Kyler Williams, a GBCI inmate who is the father of her child. McGeshick did

---

[1] The facts in this section are taken from the stipulated facts in the parties' pretrial reports (ECF Nos. 123, 127) and from the testimony and exhibits presented during the bench trial (ECF Nos. 128, 132).

not remember the details of either recorded call, explaining that her drug addiction at the time limited her recollection. In the first of the recordings, Johnson asks McGeshick to meet with "his guy" on the following Sunday to pick something up. McGeshick agrees to the meeting but states she "want[s] half." Johnson then tells her, "[T]his ain't no game." At trial, McGeshick emphasized her limited recollection but testified in response to questions from Johnson's counsel that she may have been talking about "gas money." On cross examination, however, she conceded the conversation also might have been referring to drugs. In the second call, recorded two days later, Johnson asks McGeshick if she has spoken to Williams about something that Johnson and Williams had discussed and whether she has agreed to what they had discussed.

There is no evidence confirming whether McGeshick did in fact meet with anyone, including Johnson's "guy," on the Sunday following the first call. But it is undisputed that several weeks later, on October 6, 2016, she tried to visit Williams at GBCI. The visit did not go as planned; McGeshick was arrested by the Brown County Drug Task Force in possession of ten large balloons containing 5.1 grams of marijuana. Photographs confirm that inside these ten balloons were a number of smaller balloons, apparently forty-two in total, containing the actual marijuana. (Ex. 1016, 1017.) On direct examination, McGeshick testified that an unknown inmate had called her on behalf of Williams and told her to bring the balloons to GBCI. She also claimed that Williams had never previously asked her to bring anything to him at GBCI, and she acknowledged that doing so would be against prison rules. On cross-examination, McGeshick was shown a signed statement she provided to the Drug Task Force in which she admitted that Williams asked her to smuggle drugs into GBCI on five prior occasions. (Ex. 1014.)

Five days after McGeshick's arrest, former GBCI Investigative Lieutenant William Swiekatowski issued a conduct report against Johnson, charging him with conspiracy to possess intoxicants based on his calls with McGeshick and her attempt to smuggle the marijuana balloons into GBCI. (Ex. 1000.) This "Drug Conspiracy Conduct Report" describes McGeshick as having been found with "42 balloons of marijuana." (*Id.* at 1.) The next day, on October 12, 2016, Swiekatowski wrote a similar conduct report against Williams. (Ex. 1013.) Although based on the same events as Johnson's conduct report, Williams's conduct report describes McGeshick as having been found with "10 balloons on her person." (*Id.* at 2.) Williams's conduct report notes that "[t]hose balloons each contained smaller balloons" but does not list the total balloons recovered from McGeshick. (*Id.*)

Swiekatowski testified about drafting the reports. He explained that he wrote both conduct reports after receiving a call from the Drug Task Force informing him of the smaller balloons found inside the ten balloons confiscated from McGeshick. He wrote Johnson's conduct report first, just a few days after McGeshick was arrested. He conceded that he could have amended Williams's conduct report to reflect the finding of the forty-two total balloons. But he denied drafting the reports differently to make Johnson's conduct report appear more serious. He testified he "[p]robably just missed it" and likely would have similarly missed it if the information about the balloons in Williams's and Johnson's conduct reports were reversed.

Johnson denies engaging in the conduct alleged in the conduct report. He testified that the recorded telephone conversation concerned his request that McGeshick bring money or a money order to pay a gambling debt he owed Williams. He speculated that Swiekatowski used the larger description of forty-two balloons in his conduct report to prejudice him by inflating the amount of drugs McGeshick was accused of attempting to bring into the prison.

On October 12, 2016, Johnson received notice of an October 20, 2016 hearing on the Drug Conspiracy Conduct Report. Defendant Schultz was the assigned hearing officer and was also responsible for serving Johnson with the notice. Consistent with Department of Corrections (DOC) regulations, when he served the hearing notice, Schultz offered Johnson an uncontested disposition in an effort to settle the matter and avoid a hearing. Schultz testified he was not involved with writing the conduct report or conducting the investigation. He also swore he did not speak with Swiekatowski about Johnson or the report before reviewing it and was unaware of Johnson's previous lawsuits or complaints. Schultz's offer was for 180 days' disciplinary separation. He testified he did not review any evidence (other than the conduct report itself) in arriving at this proposed disposition and had not made any final conclusions about Johnson's guilt or innocence of the charge. He also denied pressuring Johnson to accept the uncontested disposition, which Johnson ultimately rejected in any event.

At the hearing, Johnson was not allowed to call Williams as a witness. He was also not allowed to listen to portions of the recorded phone calls. While Schultz was presiding officer, he was not the official who denied Johnson's evidentiary requests. Ultimately, Schultz concluded it was "more likely than not that Mr. Johnson conspired to bring in contraband -- have contraband brought into the institution," and found him responsible for the conduct in the report. He then

sentenced Johnson to 180 days' disciplinary separation, an outcome that was half of the maximum 360 days he could have imposed for the violation.

After receiving this result, Johnson filed a complaint about the disciplinary hearing. In response, the Warden's office ordered a rehearing on the ground that the record did not show that Johnson's staff advocate had listened to the recorded calls before the hearing. The rehearing was scheduled for March 2, 2017.

Defendant Elsinger was responsible for serving Johnson with notice of the rehearing. Elsinger testified that at the time he served the notice, he had received the Drug Conspiracy Conduct Report but had not discussed its contents with Swiekatowski or the witnesses from the initial hearing. He also reported he did not ask Schultz about the initial hearing. Consistent with DOC regulations, Elsinger offered Johnson a consensual resolution. According to Johnson, Elsinger offered him an uncontested disposition of 180 days' disciplinary separation ahead of the rehearing and offered to "give [him] time served on it." Elsinger testified his offer was based on his review of the conduct report, the range of penalties allowed, and Johnson's history. Johnson declined the offer because he believed the conduct report was fabricated. Elsinger insisted he had no reason to believe Swiekatowski had fabricated the conduct report or "had any ax to grind" against Johnson. He also confirmed he made no predetermination about Johnson's guilt or innocence of the charges and denied telling Johnson that he was going to find him guilty at the rehearing. It made no difference to him whether Johnson accepted the disposition or not.

Elsinger later presided over the rehearing, although he testified that he did not know he was to be the rehearing officer when he served the notice and made the offer. At the rehearing, Johnson's staff advocate was allowed to listen to the recorded calls, and Williams's testimony was presented to the hearing officer. As to the latter point, Johnson testified Elsinger did not allow Williams into the hearing room and instead spoke with Williams outside of the room where Johnson could not hear his testimony. Johnson later learned, however, that Williams had "attempted to take responsibility for everything" except the phone calls, to which Williams was not a party. (Ex. 1000 at 11.)

Elsinger found it "more likely that not" that Johnson was guilty of conspiring to bring drugs into the prison and sentenced Johnson to 180 days' disciplinary separation. Elsinger testified he concluded Johnson was attempting to have something brought into GBCI based on the evidence presented and explained he was able "to connect the dots" after McGeshick was caught with the

4

Case 2:18-cv-01696-BHL   Filed 05/18/22   Page 4 of 13   Document 133

drugs. Elsinger explained Williams's testimony was irrelevant because Williams admitted he did not know what Johnson and McGeshick discussed during their calls. As for the discrepancy over the number of balloons, Elsinger testified he did not contact Swiekatowski and explained that the number was not important because it ultimately did not affect the more important issue—the quantity of drugs involved. Johnson insisted that Elsinger "predetermined" his guilt and found him guilty at the rehearing "based upon th[e] lie" about GBCI staff finding forty-two balloons on McGeshick.

## II. Lussier Letter Conduct Report

In December 2016, GBCI officials intercepted a letter Johnson attempted to send to another GBCI inmate, Joseph Lussier. The letter purports to discuss religious matters, but GBCI officials, including Security Threat Group Specialist Darci Stevens and Security Threat Group Coordinator Patrick Brant, believed it used coded language to seek information from Lussier and to try to recruit him and other Native Americans into gang activity. (Ex. 1003.) On December 20, 2016, Stevens wrote a conduct report against Johnson based on the Lussier Letter, charging him with "Group Resistance and Petitions" and "Enterprises and Fraud (Conspiracy)." (Ex. 1004.)

Johnson admits he spent many years as a high-ranking member of the Vice Lords gang but claims to no longer have any gang involvement. He disputes Stevens's interpretation of the Lussier Letter, however, and believes she fabricated the conduct report in retaliation for inmate complaints he filed.

Johnson received a disciplinary hearing on the Lussier Letter Conduct Report. Consistent with DOC procedure, a few weeks before the hearing, Elsinger served Johnson with a copy of the report along with a notice of the hearing. Elsinger testified he was not involved with the conduct report or the underlying investigation, did not review any evidence besides the conduct report, and made no prejudgment of Johnson's guilt or innocence before serving him the notice.

Schultz was the assigned hearing officer for the hearing. Schultz testified that, prior to the hearing, he did not speak with any witnesses and did not speak with Elsinger about Johnson or the conduct report. Schultz explained that in adjudicating the matter, he took into consideration all the evidence presented, including the statements in the conduct report, the letter itself, Stevens's testimony, Johnson's oral statement, and testimony from Lussier, who Johnson requested as a witness. Based on this evidence, he concluded that the conduct report was credible, found Johnson guilty of one of the two charges in the report, and sentenced Johnson to 90 days' disciplinary

separation out of a possible maximum 360 days. He testified no one pressured him into giving this sentence, which he believed was appropriate based on the evidence and his experience.

## III. Gang Leader Conduct Report

On January 5, 2017, Security Threat Group Coordinator Brant received and reviewed another letter that Johnson wrote, this time to an Illinois resident named Darnel Bradley. Like the Lussier Letter, the Bradley Letter appears to discuss only religious activity, but GBCI officials again believed it used coded language to discuss illegal gang activity. (Ex. 1005.) On January 11, 2017, Brant issued Johnson a conduct report based on the Bradley Letter, charging him with "Group Resistance and Petitions," "Unauthorized Forms of Communications," and "Enterprises and Fraud." (Ex. 1006.) The parties refer to this as the Gang Leader Conduct Report.

Johnson again disputes the officials' interpretation of the letter. He testified that Bradley is not a gang member and is instead a minister in the Chicago area. Johnson reiterated that he himself had "long-since retired" from gang activity by January 2017. But he acknowledged that, if he were "speaking in code," it would be reasonable for prison officials to read the language in the letter as suggesting he was still involved in gang activity.

A disciplinary hearing on the conduct report was scheduled for January 30, 2017. Schultz testified he received the conduct report, which he served on Johnson along with notice of the hearing. Consistent with DOC procedure, he again offered an uncontested disposition, this time for 120 days' disciplinary separation. He testified he was not involved with the investigation or conduct report, and, at the time of the offer, he had not reviewed any evidence besides the report or spoken with Brant about the report. Schultz also testified no one pressured him into offering the uncontested disposition and that he did not try to pressure Johnson into accepting it. He also did not make any prejudgment about Johnson's guilt or innocence and did not tell Johnson he was going to find him guilty of the conduct report.

Schultz later presided over the January 30, 2017 hearing on the conduct report. Based on the evidence presented, including Johnson's concession that he was guilty of one of the charges, Schultz found Johnson guilty of two of the three charges. Schultz testified he found no reason to believe the conduct report was fabricated and made his decision based on his review of the evidence and his experience. He sentenced Johnson to 120 days' disciplinary separation and testified no one pressured him into giving that sentence.

Johnson appealed this result, and the Warden ordered a rehearing because an inmate witness that Johnson requested (Mathew Richard) had not submitted a statement. The rehearing was scheduled for February 21, 2017, and Elsinger was assigned as rehearing officer.

At trial, Elsinger testified he was not involved in the investigation of the Bradley Letter. Elsinger reported that on the day of the rehearing, he offered Johnson an uncontested disposition of 90 days' disciplinary separation and 30 days' loss of recreation. Johnson accepted the uncontested disposition, thereby admitting his guilt of the charges and waiving his right to a hearing and an appeal. Elsinger testified he did not speak with Schultz or any witnesses about the initial hearing and offered the disposition based on his experience and what he thought was a fair sentence, not based on any predetermination of Johnson's guilt. Elsinger did not offer the uncontested disposition because of any inmate complaints Johnson filed against GBCI staff or regarding the conditions of his confinement.

## IV. Mathew Richard Testimony[2]

Johnson also introduced testimony from GBCI inmate Mathew Richard. Richard testified he has been friends with Johnson since around 2015, after they met at a religious service in GBCI. Richard was housed next to Johnson in the Restricted Housing Unit at GBCI in September 2016 and testified he overheard Schultz talk to Johnson about a conduct report for "a letter that he wrote" and another conduct report for bringing drugs into GBCI. He agreed that he also heard Johnson discuss "these conduct reports" with Elsinger. Richard said he heard GBCI staff tell Johnson he should "take the 180" and that "he's already served the time, he might as well take it now because they going to give it to him anyway." Richard characterized the statement as "a threat," as if staff were telling Johnson "it don't matter because I am going to give it to you . . . so don't waste my time."

## LEGAL ANALYSIS AND CONCLUSIONS

Johnson contends Schultz and Elsinger violated his due process rights in their handling of the disciplinary hearings on the Drug Conspiracy, Lussier Letter, and Gang Leader conduct reports. He asserts Schultz was not a neutral decisionmaker during the hearing on the Drug Conspiracy conduct report and had already decided his guilt and sentence before the hearing. He contends Elsinger was similarly biased when he presided over the rehearing on the Drug

---

[2] Johnson also named Kyler Williams as a trial witness. On the morning of trial, counsel informed the Court that Williams had absconded, his location was unknown, and he would not be appearing to provide testimony.

Conspiracy Conduct Report and predetermined his guilt on that report beforehand. Johnson asserts Schultz was biased during the hearing on the Lussier Letter Conduct Report and predetermined his sentence for his presumed guilt of that report. He contends Schultz was biased against him during the hearing on the Gang Leader Conduct Report and imposed a predetermined sentence based on his presumed guilt for that report, too.

The Due Process Clause of the Fourteenth Amendment protects the rights of prisoners facing a disciplinary offense. *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Among those is "the right to an impartial decisionmaker." *Perotti v. Marberry*, 355 F. App'x 39, 43 (7th Cir. 2009) (citing *Wolff*, 418 U.S. at 571). Federal courts presume that disciplinary hearing officers "properly discharge their duties." *Higgason v. Lemmon*, 6 F. App'x 433, 435 (7th Cir. 2001) (citing *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)). This "presumption of 'honesty and integrity'" may be overcome only with a showing of "clear evidence to the contrary." *Perotti*, 355 F. App'x at 43 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)); *see Higgason*, 6 F. App'x at 435 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). The constitutional standard to show a decisionmaker harbored "impermissible bias is high." *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)). A disciplinary hearing officer is not deemed biased if, for example, "he adjudicated or was involved in a previous disciplinary charge against the prisoner." *Perotti*, 355 F. App'x at 43 (citing *Piggie*, 342 F.3d at 666–67, and *Pannell v. McBride*, 306 F.3d 499, 502 (7th Cir. 2002)).

Johnson offers two theories to try to show the defendants were partial and biased decisionmakers in his disciplinary hearings or rehearings. First, he asserts there is direct evidence of the defendants' prejudgment of his guilt before his disciplinary hearings through the defendants' own statements. He says inmate Richard's testimony bolsters that evidence. Second, he asserts that the evidence of his guilt of each conduct report is so flawed or non-existent that the only reasonable conclusion is that the hearing officers must have been biased against him and predetermined his guilt. Both theories fail. The credible evidence supports the defendants' conduct in connection with all of Johnson's disciplinary proceedings.

I.   **Johnson's Due Process Claim on the Drug Conspiracy Conduct Report Fails on the Facts.**

Both Schultz and Elsinger testified about their general practices in handling conduct reports, serving notice of hearings, and offering uncontested dispositions to avoid a hearing. Schultz testified that, when he received a conduct report, he would review its contents and the

inmate's disciplinary history and then determine what he believed would be a fair disposition. Schultz testified he would not decide whether the conduct report was true or false, would not speak to any witnesses involved, and would not contact the officer who wrote the report. He instead would accept the conduct report "at face value" to determine a fair disposition. He then would offer an uncontested disposition to the inmate, who was free to decline it and proceed to a disciplinary hearing. Schultz testified he would never pressure an inmate into accepting an uncontested disposition or tell an inmate he would find him guilty at the hearing. Schultz testified he has in the past found an inmate not guilty of a conduct report after the inmate declined an uncontested disposition. Elsinger testified to the same.

Schultz testified that the officer who receives the conduct report and offers the uncontested disposition is not necessarily the same officer who will preside over the disciplinary hearing. In fact, the officer who receives the report usually does not know at that time whether he will also be the hearing officer. Schultz also explained that the hearing officer does not determine what witnesses or evidence will be presented at the hearing. Nor does the hearing officer have the ability to "dig a little bit deeper" into the content of the conduct report. He instead holds the hearing based on the evidence allowed and presented.

Specific to the Drug Conspiracy Conduct Report, Schultz testified he did not speak with Swiekatowski (the officer who wrote the report) about it before serving it on Johnson. He also was not involved in that investigation and did not predetermine Johnson's guilt of the charges alleged. He denied attempting to coerce Johnson into accepting the uncontested disposition of 180 days' disciplinary separation or telling Johnson that he "might as well" accept the disposition. Schultz testified that at the hearing on the conduct report, he based his decision on the evidence presented and his experience. He did not predetermine an appropriate sentence or prejudge the facts, and he was not pressured into finding a certain way or giving a certain sentence. Schultz also testified he was not involved in the decision to deny Williams from testifying at the hearing. The Court finds Schultz's testimony credible.

Defendant Elsinger similarly testified he was not involved in the investigation underlying the Drug Conspiracy Conduct Report. He denies telling Johnson to accept an uncontested disposition rather than having the rehearing on that conduct report. He did not make any predetermination of guilt or innocence before serving notice of the rehearing or before serving as the rehearing officer. Elsinger testified that before presiding over the rehearing, he did not speak

with Schultz about the initial hearing, with Swiekatowski about the conduct report, or with any other witnesses about the hearing. He determined, based on the evidence at the rehearing, that Johnson more likely than not conspired with McGeshick to bring the drugs into the prison. The Court also finds Elsinger's testimony credible.

Johnson did not testify that either defendant told him they were going to find him guilty at his disciplinary hearing or rehearing on the Drug Conspiracy Conduct Report or that either attempted to coerce or pressure him into accepting an uncontested disposition beforehand. His testimony largely focused on the veracity of the conduct report and what he perceives to be unfair treatment at GBCI. But neither the correctness of the conduct report itself nor Johnson's guilt of the charges is at issue in this lawsuit; this matter concerns whether the defendants violated Johnson's due process rights.

The only other evidence Johnson offered in support of his claims that Schultz and Elsinger were biased decisionmakers is inmate Richard's testimony that he overheard Schultz tell Johnson he should "take the 180," which he said sounded like "a threat" to Johnson not to "waste [his] time" because he would give the 180 days to Johnson anyway. Richard testified he also heard Elsinger discuss "these conduct reports" with Johnson, suggesting Elsinger was attempting to pressure Johnson into accepting an uncontested disposition before the rehearing on the Drug Conspiracy Conduct Report. This vague, scant evidence is insufficient to defeat the presumption that Schultz and Elsinger honestly and properly discharged their duties when serving Johnson notice of the hearing and rehearing on this conduct report, offering him an uncontested disposition, and serving as hearing officers. Even to the extent the Court were to accept Richard's testimony, his recollection of the overheard conversations does not overcome the defendants' credible testimony about their impartiality and is not "clear evidence to the contrary." *Perotti*, 355 F. App'x at 43.

Johnson's alternate argument, that the lack of evidence to support the Drug Conspiracy Conduct Report shows the defendants must have been biased, similarly fails. The requirements of due process are satisfied so long as "some evidence" supports the disciplinary hearing officers' decisions. *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985). There was ample evidence of Johnson's guilt of the charge in this conduct report. The intercepted calls between Johnson and McGeshick used curiously vague language, which Swiekatowski interpreted to be code for plans for a drug transaction. McGeshick showed up to the prison days later with

10
Case 2:18-cv-01696-BHL   Filed 05/18/22   Page 10 of 13   Document 133

balloons containing drugs, confirming Swiekatowski's interpretation of her calls with Johnson. This more than satisfied the "some evidence" standard that Johnson conspired to possess intoxicants. Schultz and Elsinger's decisions finding Johnson guilty of the Drug Conspiracy Conduct Report at his disciplinary hearing and rehearing were justified by reasons other than a presumption of their bias.

Johnson testified he believes Elsinger predetermined his guilt before the rehearing on the Drug Conspiracy Conduct Report. He bases this in part on his knowledge that before the rehearing, Elsinger asked either the Warden or the Security Director for approval to offer Johnson an uncontested disposition in lieu of proceeding to a hearing. But the defendants explained that this is standard procedure any time an officer serving a conduct report seeks to offer an uncontested disposition—any offered uncontested disposition up to 120 days' disciplinary separation requires the approval of the security director, and anything longer than that requires approval of the deputy warden.

The defendants' credible testimony, bolstered by Swiekatowski's account of prison policies and his handling of the Drug Conspiracy Conduct Report, defeats Johnson's claim that he was denied due process during the hearing or rehearing on this conduct report. The Court finds in favor of the defendants on this claim.

**II.    Johnson's Due Process Challenge to Schultz's Handling of the Lussier Letter Conduct Report Also Fails on the Facts.**

For largely the same reasons, Johnson's claim that Schultz denied him due process during his disciplinary hearing on the Lussier Letter Conduct Report also fails. As he did with respect to the Drug Conspiracy Conduct Report, Schultz testified he was not involved in the investigation of the Lussier Letter and did not predetermine Johnson's guilt of either charge in that report. Elsinger served notice of the hearing on Johnson, and Schultz testified he did not speak with Elsinger before the hearing about the conduct report or Elsinger's delivery of the notice. He testified that as the hearing officer, he based his decision on the evidence presented and his experience. He did not predetermine an appropriate sentence or prejudge the facts, and he was not pressured into finding a certain way or giving the sentence of 90 days' disciplinary separation (out of a possible maximum sentence of 360 days).

Johnson provided even less evidence to overcome the presumption that Schultz was a fair and impartial decisionmaker during the disciplinary hearing on the Lussier Letter Conduct Report. Johnson did not testify that Schultz told him he would find him guilty at the hearing. Richard's

testimony about overhearing the defendants speak with Johnson when serving him notice of his hearings is unhelpful to Johnson's claim on this conduct report because Schultz did not serve Johnson notice of the hearing on the Lussier Letter Conduct Report—Elsinger did—and Johnson does not make any claims against Elsinger related to the Lussier Letter. The evidence does not even suggest Schultz harbored an impermissible bias as the hearing officer on this report.

There was also at least "some evidence" of Johnson's guilt of this conduct report. GBCI Security Task Group officials reviewed Johnson's letter to Lussier and recognized several terms or words commonly used as code for discussion of gang activity. These terms and discussions coincided with Johnson's admitted past activities with the Vice Lords gang and were sent to Lussier, who GBCI officials believed Johnson was attempting to recruit into the gang or to assist in recruiting Native Americans.

There is no credible evidence suggesting that Schultz was biased during the disciplinary hearing on the Lussier Letter Conduct Report, that he predetermined Johnson's guilt of the charges in the report, or that he imposed 90 days' disciplinary separation for any improper reason. The Court finds in favor of Schultz on this claim.

### III. Johnson's Due Process Claim Concerning the Gang Leader Conduct Report Also Fails.

The Court also finds in Schultz's favor on Johnson's claim that Schultz denied him due process before and during his disciplinary hearing on the Gang Leader Conduct Report. Schultz testified he did not speak with Brant about the Gang Leader Conduct Report before serving it on Johnson and was not involved in the investigation. He testified he did not predetermine Johnson's guilt before serving him notice of the hearing or offering him 120 days' disciplinary separation as an uncontested disposition. He denied attempting to coerce Johnson into accepting the uncontested disposition. Schultz testified that as the hearing officer, he based his decision on the evidence presented and his experience. He did not predetermine an appropriate sentence or prejudge the facts, and he was not pressured into finding a certain way or giving a certain sentence.

Richard's testimony is again unhelpful to Johnson's claim. Richard testified he overheard Schultz tell Johnson to "take the 180." But Schultz did not offer Johnson 180 days' separation on the Gang Leader Conduct Report. And once again, Johnson did not testify that Schultz told him he would find him guilty at his hearing or attempted to coerce or pressure him into accepting an uncontested disposition. The Court finds Schultz's testimony credible and finds no reason to

disrupt the presumption that he was a neutral and impartial decisionmaker during the hearing on this conduct report.

There was also sufficient evidence to support Schultz's decision finding Johnson guilty of two of the three charges in the Gang Leader Conduct Report. As with the Lussier Letter Conduct Report, GBCI Security Task Group officials reviewed the letter that Johnson wrote to Bradley and concluded that it used coded language to discuss illegal gang activity. Even though Johnson insists Bradley is not a gang member, he conceded that if prison officials believed he was speaking in code (and the record is clear they did believe that), it would be reasonable for officials to read the language in the letter as suspicious and as suggesting Johnson was still involved in gang activity. He also conceded he was guilty of one of the two charges he faced in the Gang Leader Conduct Report. The evidence provided Schultz sufficient information to find Johnson guilty of the two charges and sentence him to 120 days' disciplinary separation.

## CONCLUSION

Based on the evidence presented at the bench trial, as discussed above, the Court **FINDS** in favor of defendants Schultz and Elsinger on Johnson's 14th Amendment due process claims. The Court **DENIES AS MOOT** the defendants' oral motion for a directed verdict.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day of May, 2022.

BY THE COURT:

s/Brett H. Ludwig
BRETT H. LUDWIG
United States District Judge